JUSTICE PATTERSON delivered the opinion of the Court.
**283 In this appeal, we review questions certified by the United States Court of Appeals for the Third Circuit. The Third Circuit certified the questions in the course of its review of Josh Finkelman's putative class action against defendants, the National Football League and related entities (NFL), arising from the NFL's distribution of tickets to the 2014 Super Bowl.
The certified questions concern N.J.S.A. 56:8-35.1 (section 35.1), a consumer protection statute that regulates ticket sales to sports and entertainment events. Section 35.1 provides:
It shall be an unlawful practice for a person, who has access to tickets to an event prior to the tickets' release for sale to the general public, to withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event.
The law was in force when the Super Bowl was held in New Jersey on February 2, 2014. The Legislature, however, has since repealed section 35.1, effective February 1, 2019.
The NFL, following its established practice for Super Bowl games, sold one percent of the tickets to the 2014 Super Bowl to members of the public who had won the right to purchase those tickets in an NFL-sponsored lottery. The NFL gave the remaining **284 ninety-nine percent of the tickets to teams, broadcast networks, corporate sponsors, and other individuals and entities.
Plaintiff Josh Finkelman alleges that the NFL's allocation of the 2014 Super Bowl tickets constituted "withhold[ing]" of an excessive percentage of those tickets contrary to section 35.1. In his individual capacity and as the representative of a proposed class of individuals who either bought 2014 Super Bowl tickets at premium prices on the secondary market or could not afford to do so, plaintiff seeks various remedies including treble damages *757 under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -210. The United States District Court for the District of New Jersey dismissed the action pursuant to Fed. R. Civ. P. 12(b)(6), and plaintiff appealed.
The Third Circuit submitted the following certified question to this Court: "Does plaintiff Josh Finkelman properly plead a claim under the New Jersey Ticket Law, N.J.S.A. 56:8-35.1 ?" We accepted the certified question and reformulated it as follows:
1) Is the term "person[ ] who has access to tickets to an event prior to the tickets' release for sale to the general public," as that term is used in [section 35.1], limited to ticket brokers and resellers?
2) Are tickets to an event that are sold to winners of a lottery "release[d] for sale to the general public" within the meaning of [section 35.1], and, if so, are tickets distributed to selected entities "[withheld] ... from sale to the general public" within the meaning of [section 35.1]?
In response to the Third Circuit's inquiry, we construe the term "person" in section 35.1 to include not only ticket brokers and resellers, but also other individuals and entities with "access to tickets to an event prior to the tickets' release for sale to the general public." N.J.S.A. 56:8-35.1. We view the sale of tickets to winners of the NFL's ticket lottery to constitute a "release for sale to the general public" within the meaning of section 35.1.
We conclude, however, that the Super Bowl tickets sold to lottery winners were the only 2014 Super Bowl tickets designated by the NFL for "release for sale to the general public" within the meaning of section 35.1. Accordingly, we do not consider the NFL's distribution of other tickets to the 2014 Super Bowl to its **285 teams, other selected individuals, and entities to constitute the unlawful withholding of more than five percent of "tickets to an event prior to the tickets' release for sale to the general public" under section 35.1.
I.
We derive our summary of the facts and procedural history from the Third Circuit's Certification of Questions of Law, the pleadings and briefs, and the record submitted by the parties.
A.
In 1983, the Legislature enacted the Ticket Resale Law, N.J.S.A. 56:8-26 to -38, as a provision of the CFA. L. 1983, c. 135. Pursuant to the Ticket Resale Law, the Division of Consumer Affairs in the Department of Law and Public Safety (Division) licenses ticket brokers and regulates those brokers' reselling of tickets for admission to "places of entertainment." N.J.S.A. 56:8-27 to -35.[1]
In 1997, Governor Whitman appointed the Ticket Brokering Study Commission to assess the efficacy of the Ticket Resale Law and recommend amendments to it. Among other suggestions, the Commission urged the Legislature to eliminate or curtail *758 "the holding back of tickets" from initial sales, so that "the greatest number of tickets will be available to the greatest number of ordinary fans on the initial sale to the public." Ticket Brokering **286 Study Comm'n, Dep't of Consumer Affairs, Ticket Broker Report 19 (Oct. 31, 2001).
Following the Commission's report, the Legislature enacted section 35.1 as a new provision of the Ticket Resale Law and amended the Ticket Resale Law in several other respects. The amendment was signed into law on January 8, 2002. Section 35.1 remained in effect throughout the period relevant to this appeal.
On August 24, 2018, the Legislature amended the Ticket Resale Law in several respects, effective on February 1, 2019. As part of that amendment, the Legislature repealed section 35.1 and two other provisions enacted as part of the 2002 amendments, N.J.S.A. 56:8-35.2 and -35.3. L. 2018, c. 117, § 6.
B.
In February and March 2010, the New Jersey Senate and Assembly passed resolutions urging the NFL to hold the 2014 Super Bowl in New Jersey. Later that year, the NFL announced that the 2014 Super Bowl would be held at MetLife Stadium.
Consistent with its practice in prior Super Bowl games held at stadiums in other states, the NFL did not release the tickets to the 2014 Super Bowl to a ticket broker for a public sale. Instead, it reserved one percent of the tickets for the winners of a lottery conducted in 2013. The remaining ninety-nine percent of the tickets that were not included in the lottery were allocated as follows: five percent of the remaining tickets were shared by the host teams, the New York Giants and the New York Jets; thirty-five percent were shared by the teams that played in the Super Bowl, the Denver Broncos and the Seattle Seahawks; thirty-five percent were distributed to other NFL teams; and twenty-five percent were given to NFL-connected individuals and entities including corporations, broadcast networks, media outlets, sponsors, and the Super Bowl host committee.
**287 II.
In a putative class action complaint filed in the district court, plaintiff and another class representative[2] alleged that defendants committed an unlawful practice under section 35.1 by withholding more than five percent of Super Bowl tickets from sale to the general public. Plaintiff contended that some of the tickets allocated to the NFL teams not playing in the Super Bowl were sold to ticket brokers, who in turn sold those tickets on the secondary market at inflated prices. He asserted that, as a result of defendants' violation of section 35.1, the two tickets he purchased on the secondary market were bought at an inflated price: two thousand dollars for each ticket, more than twice each ticket's face value of eight hundred dollars. Plaintiff sought certification of a class including "all persons who paid for, or will pay for, or could not afford to pay for tickets to [the 2014 Super Bowl] in excess of the printed ticket price."
Pursuant to Fed. R. Civ. P. 12(b)(6), the district court granted defendants' motion to dismiss plaintiff's complaint for failure to state a claim. In addition to addressing plaintiff's and the other class representative's standing, plaintiff's claim for unjust enrichment, and the question of causation, the district court found that defendants did not commit an unlawful practice under section *759 35.1. The court reasoned that because the NFL did not "withhold" tickets as that term is used in section 35.1 and did not release those tickets to the general public, the NFL's method of allocating those tickets did not contravene the statute.
The Third Circuit affirmed in part and reversed in part the district court's decision. Finkelman v. NFL, 810 F.3d 187, 203 (3d Cir. 2016). The circuit court affirmed the determination that the other class representative lacked standing but reversed as to plaintiff, finding that he also lacked standing. The panel therefore dismissed plaintiff's claims without prejudice for lack of subject matter jurisdiction. Ibid.
**288 In an amended complaint, plaintiff expanded his allegation that the NFL violated section 35.1 in its distribution of tickets to the 2014 Super Bowl and supported that allegation with an expert's report. The district court again granted defendants' motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). In addition to determining standing and CFA causation questions, the district court held that plaintiff failed to state a claim under section 35.1. It construed section 35.1 to apply only to ticket brokers, not to event sponsors such as the NFL, and concluded that the NFL had not "withheld" tickets because it had not retained tickets in its custody.
Plaintiff again appealed the district court's judgment. After addressing the district court's rulings on standing and causation, the Third Circuit issued its certified question in accordance with Rule 2:12A-1. We accepted the certified question and reformulated it pursuant to Rule 2:12A-2. We also granted the motion of the New Jersey Business and Industry Association (NJBIA) to appear as amicus curiae.
III.
Plaintiff contends that N.J.S.A. 56:8-35.1 is not limited to ticket brokers and resellers because the Legislature's definition of "person" is broader than its definition of "ticket broker." He claims that that the NFL's Super Bowl ticket lottery constituted a release of tickets for sale to the general public for purposes of section 35.1. Plaintiff argues that the NFL's allocation of ninety-nine percent of the Super Bowl tickets to individuals and entities connected to its operations constitutes a "withholding" of tickets for sale within the meaning of section 35.1.
The NFL agrees that section 35.1 does not limit the definition of a "person" to ticket brokers and resellers. It contends, however, that Super Bowl tickets purchased by lottery winners were not released to the general public for purposes of section 35.1. The NFL construes the statute to apply only to events for which the **289 sponsor makes tickets available to the general public, and argues that the 2014 Super Bowl did not constitute such an event.
Amicus curiae NJBIA argues that the NFL was not a "person" with access to tickets "release[d] for sale to the general public" within the meaning of section 35.1. It asserts that even if the NFL's lottery constitutes a sale of tickets "to the general public" under the statute, the NFL did not withhold any of "those tickets" from the lottery, and therefore did not violate section 35.1.
IV.
A.
When we interpret a statute, we strive to effectuate the Legislature's intent. Cashin v. Bello, 223 N.J. 328, 335, 123 A.3d 1042 (2015) ; DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). We begin with the "best indicator" of that intent, the statute's plain language.
*760 DiProspero, 183 N.J. at 492, 874 A.2d 1039. Unless it is "inconsistent with the manifest intent of the legislature," or "another or different meaning is expressly indicated," we ascribe to the Legislature's words and phrases "their generally accepted meaning, according to the approved usage of the language." N.J.S.A. 1:1-1. We construe the statutory language "in context with related provisions so as to give sense to the legislation as a whole." Spade v. Select Comfort Corp., 232 N.J. 504, 515, 181 A.3d 969 (2018) (quoting N. Jersey Media Grp., Inc. v. Township of Lyndhurst, 229 N.J. 541, 570, 163 A.3d 887 (2017) ).
"If the plain language leads to a clear and unambiguous result, then [the] interpretative process is over." Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386, 143 A.3d 254 (2016) (quoting Richardson v. Bd. of Trs., PFRS, 192 N.J. 189, 195, 927 A.2d 543 (2007) ). The Court "may turn to extrinsic evidence [of legislative intent], 'including legislative history [and] committee reports' " when the statutory language is ambiguous. DiProspero, 183 N.J. at 492-93, 874 A.2d 1039 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75, 861 A.2d 123 (2004) ). "Such **290 ambiguity can arise when a statute 'is subject to varying plausible interpretations,' or when literal interpretation of the statute would lead to a result that is inherently absurd or at odds with either public policy or the overarching statutory scheme of which it is a part." Cashin, 223 N.J. at 336, 123 A.3d 1042 (quoting State v. Fleischman, 189 N.J. 539, 548, 917 A.2d 722 (2007) ).
Section 35.1 is a provision of the CFA, a remedial statute enacted "to combat 'sharp practices and dealings' that victimized consumers by luring them into purchases through fraudulent or deceptive means." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 121, 85 A.3d 947 (2014) (quoting Cox v. Sears Roebuck & Co., 138 N.J. 2, 16, 647 A.2d 454 (1994) ). Accordingly, the statute is "applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576, 25 A.3d 1103 (2011) (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546 (1997) ).
B.
1.
Section 35.1 provides that it is an unlawful act for "a person, who has access to tickets to an event prior to the tickets' release for sale to the general public," to "withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event." N.J.S.A. 56:8-35.1. Our first inquiry is whether the term "person," as used in that provision, denotes only ticket brokers and resellers, or whether it applies more broadly to other individuals and entities who have "access" to tickets prior to their release for sale to the general public.
The plain language of the Ticket Resale Law clearly establishes that the Legislature did not intend to limit section 35.1's reach to ticket brokers and resellers. The Legislature defined "ticket broker" to mean "any person situated in and operating in this State who is involved in the business of reselling tickets of admission to **291 places of entertainment and who charges a premium in excess of the price, plus taxes, printed on the tickets," subject to certain specified exclusions. N.J.S.A. 56:8-26(f). That term appears in provisions of the Ticket Resale Law that address the licensing and regulation of ticket brokers and limit the premium that can be collected by resellers who are not registered ticket brokers. See N.J.S.A. 56:8-27, -28, -29, -30, -33, -35.2. In short, the Legislature intended certain provisions of the Ticket *761 Resale Law to specifically address the activities of ticket brokers, and accordingly used that term. Ibid.
In contrast, the Legislature used the term "person" in section 35.1 and several other provisions of the Ticket Resale Law. N.J.S.A. 56:8-35.1 ; see also N.J.S.A. 56:8-33(b) (barring any "person other than a registered ticket broker" from reselling, or purchasing with the intent to resell, "a ticket for admission to a place of entertainment" at a premium in excess of the prescribed amount); N.J.S.A. 56:8-34 (prohibiting, with exceptions identified in the statute, any "person" from reselling or purchasing with the intent to resell in specified areas "adjacent to or in the vicinity of any place of entertainment in this State as determined by the [Director of the Division]"); N.J.S.A. 56:8-35 (providing that a "person who gives or offers anything of value to an employee of a place of entertainment in exchange for, or as an inducement to, special treatment with respect to obtaining tickets" violates the statute); N.J.S.A. 56:8-35.4 (prohibiting "any person" from using a "digger" to acquire any ticket). The term "person" is defined for purposes of the Ticket Resale Law to include "corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals." N.J.S.A. 56:8-26(c).
Section 35.1's plain language thus evinces a legislative intent to apply the statute not only to ticket brokers and resellers, but also to a broader class of individuals and entities with "access to tickets to an event prior to the tickets' release for sale to the general public." See DePascale v. State, 211 N.J. 40, 73, 47 A.3d 690 (2012) ("[W]hen the legislature uses certain language in one **292 part of the statute and different language in another, the court assumes different meanings were intended." (quoting Norman J. Singer & J.D. Shambie Singer, 2A Sutherland Statutory Construction § 46:6 (7th ed. 2007) ) ). Accordingly, we conclude that the term "person[ ] who has access to tickets to an event prior to the tickets' release for sale to the general public," as that term is used in section 35.1, is not limited to ticket brokers and resellers, and answer the first certified question in the negative.
2.
We next consider whether tickets sold to winners of the NFL's lottery were "release[d] for sale to the general public" within the meaning ofsection 35.1.
The record reveals that the NFL conducted its 2014 Super Bowl ticket lottery in order to make a limited number of tickets available to the general public. The public was invited to submit entries for two components of the lottery, one for wheelchair-accessible seating and the other for non-wheelchair-accessible seating, by a specific deadline months before the 2014 Super Bowl. Winners were selected by random drawing.
Each lottery winner was permitted to purchase two tickets at the tickets' face value. To deter the resale of lottery winners' tickets, the NFL required each winner to personally pick up his or her tickets at the stadium box office on the day of the Super Bowl.
Applying section 35.1's plain language, it is clear that the ticket lottery effected a "release" of tickets for sale to the "general public" for purposes of section 35.1. The lottery winners were members of "the general public" as that term is used in the statute. The fact that the winners were selected from a broader pool of entrants does not undermine that conclusion; nothing in section 35.1 or its legislative history suggests that in order for a release of tickets to constitute a "release for sale to *762 the general public," tickets must be made available to any member of the public who wants to purchase them. The tickets provided to those winners were indeed "release[d] for sale" to the winning entrants; **293 the NFL did not donate tickets to the lottery winners, but sold two tickets at face value to each winner. Thus, when the NFL made one percent of the 2014 Super Bowl tickets available for sale to the lottery winners it "released" those tickets for sale.
We thus conclude that tickets sold to the winners of the 2014 Super Bowl lottery were "release[d] for sale to the general public" within the meaning of that provision, and answer the first component of the second certified question in the affirmative.
3.
Our final inquiry is whether the tickets distributed to selected entities -- in this case, the ninety-nine percent of 2014 Super Bowl tickets given to NFL teams, corporations, broadcast networks, media, sponsors, and the Super Bowl host committee -- constitute "tickets to an event prior to the tickets' release for sale to the general public" that are "[withheld] ... from sale to the general public" within the meaning of section 35.1. The Ticket Resale Law's definitional provision does not address the meaning of the language at issue in this inquiry. N.J.S.A. 56:8-26.
According to plaintiff, the Legislature enacted section 35.1 to ensure that ninety-five percent of all seats for an event would be available to the general public for purchase. A statute that imposed that requirement would certainly ensure public access to the vast majority of seats to a given event. It would restrict or eliminate the sale of coveted sports playoff tickets to season ticket holders and the reservation of prime theater seats to subscribers. It would curtail a college's ability to assign specific sections of a stadium for students or alumni and limit a sponsor's authority to allocate tickets for entertainers' fan clubs or commercial partners. Had the Legislature intended to impose such a restriction, it could have done so in unmistakable terms.
Section 35.1's plain language suggests the Legislature sought to impose a more modest constraint on the sale of tickets to sports and entertainment events. In the first of the statute's three references to "tickets," that term is part of the phrase "a person[ ]
**294 who has access to tickets to an event prior to the tickets' release for sale to the general public." N.J.S.A. 56:8-35.1. With that statutory language, the Legislature defined the subset of the tickets for a given event that are limited by the statute: tickets designated for release to the general public that would be included in such a release were they not withheld. Ibid. That language reflects a primary goal of the statute: to deter sponsors, ticket brokers, and others from diverting tickets from an initial public sale to the secondary market, thus driving up ticket prices.
Next, section 35.1 prohibits the withholding of "those tickets" -- a plain reference to the preceding description of tickets accessed "prior to the tickets' release for sale to the general public" -- in an amount exceeding five percent of all available seating for the event. Ibid. The statute does not impose a limit on withholding any tickets, but restricts only the withholding of the subset of tickets that would otherwise be made available in a public sale.
In short, by the statute's express terms, the Legislature imposed restrictions only on the withholding of tickets that would -- if not diverted -- be destined to be available for sale to the general public. There is no evidence in section 35.1's language -- or *763 its history over the seventeen years for which it was effective and during which New Jersey hosted countless sports and entertainment events -- that the Legislature intended it to be the draconian measure that plaintiff describes.
We do not suggest that section 35.1 is entirely irrelevant to the 2014 Super Bowl, in which the NFL conducted its only "sale to the general public" through its lottery. The provision plainly would be implicated if the NFL, or another individual or entity within the statutory definition of "person," were to withhold more than five percent of the tickets designated for lottery winners, thus reducing the number of tickets available to those winners to a number below the intended one percent. N.J.S.A. 56:8-35.1.
No such unlawful withholding of tickets reserved for lottery winners, however, is alleged in this case. Instead, plaintiff's claim is premised on the purchase of two tickets that the NFL distributed **295 to an unidentified entity, and which were resold at a premium on the secondary market. Thus, the tickets at the heart of plaintiff's action were part of the ninety-nine percent of tickets reserved long before the 2014 Super Bowl for specific entities with ties to the NFL. Those tickets were never destined to be part of a public sale. Consequently, no "person" had "access" to those tickets "prior to the tickets' release for sale to the general public," and no "person" could "withhold those tickets from sale to the general public" in advance of such a sale. N.J.S.A. 56:8-35.1.
Accordingly, we conclude that tickets distributed to selected entities were not "[withheld] ... from sale to the general public" within the meaning of section 35.1, and answer the second component of the second certified question in the negative.
V.
In responding to the certified questions, we strive to advance the consumer protection objectives expressed by the Legislature when it enacted section 35.1, consistent with the limits imposed by the statutory text. If our interpretation of section 35.1 does not reflect the Legislature's intended goal in the regulation of ticket distribution for New Jersey events, the Legislature may elect to replace the repealed statute with a provision that clarifies the State's public policy with respect to that issue.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON'S opinion.

The Ticket Resale Law defines a "place of entertainment" to include "any privately or publicly owned and operated entertainment facility within this State, such as a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held and for which an entry fee is charged." N.J.S.A. 56:8-26(d). The Legislature exempted from the Ticket Resale Law "any person who sells, raffles or otherwise disposes of the ticket for a bona fide nonprofit or political organization when the premium proceeds are devoted to the lawful purposes of the organization." N.J.S.A. 56:8-38.

The other representative is no longer a party to this matter.